FILED

Dec 8  3 32 PM '03

U.S. DISTRICT COURT
NEW HAVEN CONN

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARCHELLE BAILEY | : | 3:03 CV 300 (MRK) |
| VS. | : | JURY TRIAL DEMANDED |
| WINKLE BUS COMPANY, | | |
| LAURIE WINKLE,<br>in her individual and official<br>capacities | | |
| AND | | |
| CRAIG WINKLE,<br>in his individual and official<br>capacities | : | DECEMBER 5, 2003 |

## SECOND AMENDED COMPLAINT & JURY TRIAL DEMAND

Comes now, Marchelle Bailey, by her attorney Justine FitzGerald Miller, and makes the following for her Second Amended Complaint. A jury trial is demanded.

### PRELIMINARY STATEMENT

1.  This is an action for damages on account of discrimination against the Plaintiff due to her race, depriving Plaintiff of rights and privileges of a citizen of the United States; failure to prevent and failure to aid in preventing Plaintiff's deprivation of rights and privileges of a citizen of the United States; retaliatory conduct against the Plaintiff; wrongful constructive discharge; and acts of tortious and other wrongful,

injurious, unlawful conduct. It is brought under Title VII of the Civil Rights Act of 1964, as amended, the Civil Rights Act of 1991, ("Title VII"), 42 U.S.C. Sec. 2000e, et seq. and 42 U.S. C. 1981.

### PARTIES, JURISDICTION AND VENUE

2.   Plaintiff Marchelle Bailey (hereinafter "Bailey"), is a citizen of the United States and State of Connecticut residing in West Haven, Connecticut.

3.   Defendant Winkle Bus Company (hereinafter "the Company") is a corporate entity organized, upon information and belief, under the laws of the State of Connecticut having principal places of business located in Milford and West Haven, Connecticut.

4.   Defendant Laurie Winkle (hereinafter "L. Winkle") is a duly authorized officer and manager of the Winkle Bus Company holding the position of .

5.   Upon information and belief, L. Winkle is a citizen of the United States and resident of the State of Connecticut.

6.   Defendant Craig Winkle (hereinafter C. Winkle") is a duly authorized officer of the Winkle Bus Company holding the position of supervisor of the West Haven site.

7.   Upon information and belief, C. Winkle is a citizen of the United States and resident of the State of Connecticut.

8.      Jurisdiction over Plaintiff's claims under Title VII, the Civil Rights Act of 1991, 42 U.S.C. Sec. 1981. Jurisdiction over Plaintiff's claims under Title VII, Title I, the Civil Rights Act of 1991 are jointly or in the alternative based on 42 U.S.C. Sec. 2000e-5(f)(3).

9.      Venue is proper under 28 U.S.C. Sec. 1391(b) because the events giving to Plaintiff's claims occurred in this district. Since the relevant employment records are maintained in Connecticut, employer has principal office in this district, and Plaintiff would have worked in this district but for unlawful employment practices, proper venue is also provided under 42 U.S.C. Sec. 2000e-5(f)(3) for Plaintiff's Title VII claims.

## PROCEDURAL HISTORY

10.     Plaintiff, Marchelle Bailey, is an individual aggrieved by the conduct of the defendants.

11.     Plaintiff, within 180 days of the acts complained of, filed Charges of Discrimination with the Connecticut Commission on Human Rights and Opportunities (CCHRO) and Equal Employment Opportunities Commission (EEOC) on or about June 26, 2002.

12.     On November 20, 2002 CCHRO issued to Bailey a Release of Jurisdiction.

3

13. On December 10, 2002 EEOC issued to Bailey a Notice of Right to Sue.

14. This action is brought within ninety (90) days of receipt of each such notice respectively.

## FACTUAL BASIS OF CLAIM

15. Plaintiff, Marchelle Bailey, is a Caucasian female.

16. On or about March 3, 2000 Bailey began her employment with Defendant Winkle as a bus driver, both for school and charter purposes.

17. Over the course of Bailey's employment she was not assigned the charter runs which had been agreed upon, but rather was assigned "Yard" chores (i.e. cleaning the rest rooms and other janitorial tasks).

18. On information and belief drivers who were not Caucasian and had less experience and seniority than Bailey were assigned charter runs

19. On or about April 9, 2002 Bailey was compelled to leave her employment on as a result of racial discrimination, verbal abuse and physical abuse sustained at the hands of her employer and co-workers.

20. Winkle utilizes a radio system (hereinafter "the radio") in order to facilitate communication between buses and the "Yard" or "base".

4

21.   On June 7, 2000 Bailey filed an incident report (hereinafter "June Incident Report") in which she reported threats made against her.

22.   In the June, 2000 Incident Report Bailey reported threats of physical violence made over the radio.

23.   The aforementioned threats were made by "Jason" an African American co-worker whom Bailey had been hired to replace and who was subsequently rehired by Winkle.

24.   Upon Bailey's return to the Yard, Jason continued to make threats against Bailey in the presence of C. Winkle.

25.   In the June, 2000 Incident Report Bailey states that she and C. Winkle went into "Leo Parker's office and Craig said, 'What happened?' Leo said "I heard Jason threaten to punch Marcie in the mouth over the radio. Marcie was talking to a student and did nothing wrong.'"

26.   Upon information and belief, no disciplinary action was taken against Jason for this misconduct.

27.   On June 9, 2000 Bailey reported the incident detailed in the June Incident Report to L. Winkle.

5

28. On information and belief L. Winkle took no disciplinary action against C. Winkle or Jason.

29. On or about July 11, 2001 Bailey was assigned a run to Foote Park which involved two (2) buses).

30. The second bus was driven by Jason.

31. On this run Bailey was following Jason who was traveling at a high rate of speed which made it difficult for Bailey to keep up with him.

32. Bailey realized that Jason had taken a route which contained an overpass with insufficient clearance for the vehicle she was operating.

33. Jason, in attempting to clear the overpass, damaged the "hatch" portion of his bus.

34. After Jason cleared the overpass, Bailey attempted to reach him by radio several times, but he did not respond; nor did he exit his bus.

35. Bailey then secured and exited her bus, walked to Jason's bus and suggested to Jason that the passengers aboard her bus be transferred to Jason's bus; Plaintiff would then return to the "Yard."

36. Jason suggested in the alternative that he attempt to direct Bailey through the overpass which Plaintiff attempted.

37. It became clear to her that she was not going to successfully negotiate the overpass without damaging the bus and Bailey refused to make any further attempts to negotiate the overpass.

38. With the help of a driver from another bus company and Jason, Bailey was safely able to back up the street and follow the driver from the other bus company to the destination.

39. Bailey, upon reaching her destination did not make any comment to Jason.

40. Bailey, upon return to the Yard did not make any comment to C. Winkle although, he did comment to her that "Angel did the same thing once."

41. On or about July 11, 2001 Bailey prepared an incident report detailing the incident described in ¶¶ 30 - 40, above.

42. On or about July 22, 2001 Bailey prepared another incident report (hereinafter "July 2001 Incident Report") detailing a subsequent incident detailed in ¶¶ 45-58 below.

43. In the July 2001 Incident Report, Bailey again reported Jason, the same co-worker involved in the incident reported in Bailey's June 2000 Incident Report, and she also another African American co-worker known to Bailey as "Sly".

44. In the July 2001 Incident Report, Bailey relates that because she was unfamiliar with how to proceed to the destination of a charter run that day she had told Jason and "Sly" that she would follow them.

45. Bailey was abandoned by both Jason and "Sly" very shortly after the run began when "Sly" went in one direction and Jason went in another.

46. Bailey elected to follow Jason, whom she lost sight of because he was traveling at a high rate of speed.

47. As a result of Jason and "Sly" abandoning Bailey, she was left to locate the destination of the run on her own, and in a position, where, were it not for Bailey's better judgment, she could have put the lives of her passengers and self in jeopardy.

48. When Bailey attempted to contact Jason and "Sly" over the radio, neither responded to her calls until after her arrival at the destination of the run.

49. Upon reaching her destination and successfully contacting Jason and "Sly" by radio, Bailey was angry and confronted Jason and "Sly" with a comment such as "Very funny."

50. Both Jason and "Sly" acted as if the entire incident was Bailey's fault.

51. As a result of their conduct and demeanor, Bailey was greatly upset and remained behind at her bus while the others went to the beach.

8

52. After a period of time, Bailey was so upset and felt nauseous as a result of the incident which had occurred that she decided that it was unsafe for her to make the return trip with passengers.

53. She attempted to contact Winkle by pay phone but was unable to do so because the phone would not make a direct long distance call and Winkle does not accept collect calls.

54. Bailey then located Jason and instructed him to call C. Winkle to have another bus make the return trip.

55. On information and belief, Jason and "Sly" had made a plan that they would "ditch" Bailey.

56. On information and belief, neither Jason nor "Sly" was disciplined for this incident.

57. On information and belief the treatment to which Bailey was subjected by co-workers was a result of racial animosity.

58. Only or about July 23, 2001 Bailey forwarded to L. Winkle a letter in which she detailed her concerns about the ongoing harassment she was receiving from co-workers.

59.  Upon information and belief, the Company took no action to address the concerns expressed by Bailey in her letter detailed in ¶59, above.

60.  On April 9, 2002 another driver, Dorothy Dove (an African-American female), as was her custom, was utilizing the radio for purposes outside the scope of its intended purpose.

61.  On this date, the inappropriate use of the radio was having a detrimental effect on Bailey's ability to concentrate on her driving.

62.  As a result of the distraction which was created by Dove, Bailey told Dove to "Shut up."

63.  Dove continued with her inappropriate use of the radio and began to make verbal threats against over the radio.

64.  While dropping off passengers at Meloy School in West Haven, Connecticut, Bailey was approached by Dove who was at that location for the same reason.

65.  While passing Bailey, Dove made an obscene gesture directed to Plaintiff.

66.  When she received no response from Bailey, Dove then directed the comment "I see you took your medication today." to Plaintiff.

67. Dove then exited her bus which was left running while still loaded with passengers (a violation which subjected Dove to possible termination) and boarded the bus which stood between the one she was operating and the one operated by Bailey.

68. Dove did not re-board her bus until school staff exited the building to begin disembarking passengers.

69. Complainant directed a report of the obscene gesture to C. Winkle over the radio.

70. Complainant received no response confirming receipt of her report from C. Winkle or any other dispatcher then on duty.

71. Upon return to the "Yard", Dove boarded the bus operated by Bailey and forced Plaintiff to the rear of the bus while shouting and yelling threats.

72. This incident was witnessed by C. Winkle.

73. Upon information and belief, no disciplinary action against Dove was taken by C. Winkle, L. Winkle or Winkle.

74. On April 9, 2002, upon her return to the "Yard" for the afternoon school runs, Bailey proffered an apology to Dove in an effort to diffuse the dispute between she and her co-worker.

11

75. Bailey was physically attacked by Dove upon proffering her apology; Dove shoved Bailey against an inside wall of the drivers' lounge causing physical injury to Bailey.

76. The injuries sustained by Bailey are the result of not only of Dove's action but the failure of Winkle, by and through its agents/employees/officers C. Winkle and L. Winkle to take any disciplinary action against Dove or any other African - American after the incident which had occurred on the morning of April 9, 2002.

77. After the incident described in ¶¶ 60 - 77, above, Bailey sought medical attention for her physical injuries and did not return to work again.

78. Bailey;'s decision to leave her employment with the Company was a direct result of the wrongful conduct of the Company, L. Winkle, C. Winkle and agents/employees of the Company and constitutes wrongful constructive discharge.

79. The course of conduct described above is not in accordance with the custom or usage of the Company and was contrary to the treatment received by other non - Caucasian persons and otherwise similarly situated.

80. The course of conduct described above is not in accordance with the custom or usage of Winkle and was contrary to the treatment received by other non-Caucasian persons that were otherwise similarly situated.

### COUNT ONE AS TO WINKLE BUS COMPANY
### DISCRIMINATION ON THE BASIS OF RACE
### IN VIOLATION OF TITLE VII

81. Paragraphs 1 though 80 are hereby incorporated and replead as if fully set forth herein.

82. The course of conduct described above is not in accordance with the custom or usage of Winkle and was contrary to the treatment received by other non-Caucasian persons that were otherwise similarly situated.

83. Winkle's harassment, physical and emotional injuries, and constructive discharge of Bailey were due to her race in violation of Title VII.

84. As a result of such wrongful conduct, Bailey was forced to end her employment and suffered and continues to suffer loss of income and benefits.

85. Further, Bailey has suffered emotional pain and suffering, inconvenience, mental anguish and loss of enjoyment of life.

## COUNT TWO
## DISCRIMINATION ON THE BASIS OF RACE
## IN VIOLATION OF 42 U.S.C. 1981
## AS TO ALL DEFENDANTS

86. Paragraphs 1 though 80 are hereby incorporated and replead as if fully set forth herein.

87. Defendants' conduct as described above was due to Bailey's race in violation 42 U.S.C. 1981.

88. The course of conduct described above is not in accordance with the custom or usage of Winkle and was contrary to the treatment received by other non-Caucasian persons that were otherwise similarly situated.

89. As a result of the foregoing conduct Bailey has been constructively discharged from her employment and suffered loss of income and benefits.

90. On information and belief Bailey will continue to suffer other monetary losses in the future.

91. Further Bailey has suffered emotional pain and suffering, inconvenience, mental anguish and loss of enjoyment of life.

92. On information and belief, Bailey will in the future suffer emotional pain and suffering, inconvenience, mental anguish and loss of enjoyment of life.

14

**CLAIM FOR RELIEF**

Wherefore the Plaintiff demands:

1. Compensatory Damages

2. Punitive Damages

3. Costs of Litigation

4. Reasonable Attorney's fees.

5. Such other relief as the Court may deem fair and equitable.

THE PLAINTIFF
MARCHELLE BAILEY

By *Justine FitzGerald Miller*
Justine FitzGerald Miller
Law Offices of Justine F. Miller
258 Church Street
P.O. BOX 3261
New Haven, CT 06510
Telephone (203) 865-6401
Federal Bar # CT 07957

## CERTIFICATION

It is hereby certified that a copy of the foregoing was sent via first class mail, postage prepaid on the ___5TH___ day of December, 2003 to the following counsel of record:

Ann Noble Walker
Robinson & Cole, LLP
280 Trumbull Street
Hartford, CT 06103-3597

Allison Daly
Robinson & Cole, LLP
280 Trumbull Street
Hartford, CT 06103-3597

_____
Justine FitzGerald Miller

16